**ANDERSON et al. v. PICKENS et al.**

No. 11250—Opinion Filed June 19, 1923.

**1. Trial—Demurrer to Evidence—Effect as Admission.**

The test applied to a demurrer to the evidence is that all the facts which the evidence in the slightest degree tends to prove, and all inferences or conclusions which may be reasonably and logically drawn from the evidence, are admitted. The court cannot weigh conflicting evidence, but must treat the evidence as withdrawn which is most favorable to the demurrant.

**2. Same—Replevin.**

In this case, record examined, and the court finds that it was error to sustain a demurrer to plaintiffs' evidence.

(Syllabus by Maxey, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Seminole County; J. W. Bolen, Judge.

Action by F. E. Anderson et al., against Jacob Pickens and First State Bank of Seminole, Okla. Judgment for defendants, and plaintiffs bring error. Reversed.

C. Dale Wolfe, for plaintiffs in error.

A. M. Fowler, for defendants in error.

Opinion by MAXEY, C. This is a replevin suit brought by plaintiffs in error, plaintiffs below, and hereafter referred to as plaintiffs, against defendants in error, defendants below, and hereafter referred to as defendants. The facts are stated in the opinion. It appears from the record in this case that on the 20th day of October, 1912, the plaintiffs contracted for 150 bales of cotton to be delivered to them by Jacob Pickens. The facts in regard to this purchase are, that J. A. Farriss. who was the representative of the plaintiffs, called on Jacob Pickens at Seminole and bought from him 150 bales of cotton at 10 7-8 F. O. B. Seminole, and that Jacob Pickens signed a written confirmation of said sale as follows:

"Seminole, Okla., 10-29-12.

"Anderson, Clayton & Co.,
"Shawnee, Okla.
"Gentlemen:

"I beg leave to confirm sale of 150 B-C basis middling @ 10 7-8 F. O. B. Seminole. Compress weights guaranteed.

"J. B. Pickens."

On Saturday evening following the 29th day of October, 1912, Pickens called at the business house of the plaintiffs in Shawnee and told them that he had the cotton in the yard and wanted it covered by insurance.

The plaintiffs furnished Pickens with the 150 tags, serial number of plaintiffs', to place on each bale as a means of identification; and it appears under their method of insurance the cotton then became insured. About ten days after this purchase, Farriss went to Seminole to receive and ship out the cotton, and found it tagged with plaintiffs' tags. Pickens stated to Farriss at that time, that he had 40 or 50 more bales of cotton to gin out, and he would like to sell that to him and clean up. Farriss replied that he had to go to Maud to receive some cotton there, and that he would go on over there and come back later on and receive this 150 bales of cotton, and would buy the other cotton that he had to gin out. On the next day after Farriss was at Seminole, Clark, the cashier of the defendant bank of Seminole, called up Farriss at Maud over the phone and told him that he was going to take the cotton for the bank, and that he had taken it away from Pickens, and that he (Farriss) need not come back to get it because they would not let Pickens deliver it to him. Farriss immediately returned to Seminole and went to see Clark, the cashier, and wanted to know what the trouble was. Clark told him that Pickens was owing the bank and that cotton had advanced in price from 10 7-8 to 12-15, and that they had taken the cotton from Pickens in order to clean up what Pickens was owing them. Farriss insisted that he had bought the cotton from Pickens, had it tagged and insured, and offered to pay the bank the amount the plaintiffs owed Pickens for the 150 bales. This was figured up and Farriss tendered the bank the full amount the plaintiffs owed for the 150 bales; but Clark, acting for the bank, refused to accept it, and Farriss notified plaintiffs by phone at Shawnee of the controversy with the bank, and the next day plaintiffs brought this replevin suit. The defendant bank gave a redelivery bond and kept the cotton.

On the trial of the case, J. A. Farriss testified that he bought 150 bales of cotton from Pickens on the 29th day of October, 1921; and that on the Saturday following the 29th, Pickens came to plaintiff's place of business at Shawnee and reported he had the cotton in the yard and wanted it covered by insurance. Plaintiffs furnished him with 150 serial tags to place on the bales of cotton, and under the arrangement of insurance, these tags had the effect of insuring the cotton. He stated that ten days afterwards, he went to Seminole to receive and ship out this cotton, and that when he got there Pickens told him he had the cotton ready, but he had 40 or 50 bales that he wanted

·to gin out and clean up, and that he (Farriss) had a lot of cotton to receive at Maud, a short distance from Seminole, and Pickens said, "You go on to Maud and when you get through there come back here and I will have the other cotton ginned and I will sell that to you and clean up." Farriss said he then went to Maud and the next day Clark called him up and told him that he need not come back there to receive that cotton from Pickens because they had taken it away from Pickens, and would not let him deliver it to Farriss. Farriss then went back to Seminole and had a talk with Clark, and Clark told him that Pickens was owing them, or the bank, and that they had taken Pickens' cotton in order to clean up with him. Farriss insisted that he had bought the cotton, and tendered a draft in payment for it after it was figured up, but Clark refused to accept the draft, and said that cotton had advanced, and they were going to take the cotton and apply it on what Pickens owed the bank. Farriss stated that they had gotten cotton several times that season from Pickens, and that their customary way of handling the deal was to go to the bank and get the yard tickets, figure up what the deal amounted to, and he would give Pickens a draft for the money and Pickens would leave the draft in the bank, and that he expected to handle this deal in the same way, and, no doubt, would have been able to do so, had there not been a sharp advance on cotton between the date that Farriss purchased it and the date that he went to receive it.

The evidence shows that this advance in the price of cotton amounted to something over $900 profit on the deal, and that plaintiff lost that amount by reason of the bank preventing Pickens from delivering the cotton to them. The whole contention between the parties is that the plaintiffs claim that the deal made by Farriss with Pickens, and Pickens' confirmation, constituted a sale of the cotton, and that the tagging of the cotton by Pickens, with plaintiffs' tags, completed the delivery of the cotton so that the title was complete in the plaintiffs. The defendants, on the other hand, claim that this was not a completed sale.

Only one witness was examined, and that was J. A. Farriss, and at the close of his testimony, defendants demurred to the evidence, and the court sustained the demurrer. Was this error? We think it was. We have read the testimony of Farriss very carefully, and when tested by the rule laid down in the cases of Caulk v. Lowe, 74 Oklahoma, 178 Pac. 101, Rose v. Woldert Gro. Co., 54 Okla. 566, 154 Pac. 531 and other cases from this court following the same rule as in the two cases cited laid down the following:

"The test applied to a demurrer to the evidence is that all the facts which the evidence in the slightest degree tends to prove, and all inferences and conclusions which may be reasonably and logically drawn from the evidence, are admitted. The court cannot weigh conflicting evidence, but must treat the evidence as withdrawn which is more favorable to the demurrant."

Now, applying this test to the testimony of Farriss given on the trial, we are constrained to hold that the court erred in sustaining defendants' demurrer to the evidence, and for that error the case must be reversed. The deal between Farriss and Pickens, including the tagging of the cotton with plaintiffs' tags by Pickens himself constituted a delivery of the cotton to the plaintiffs, and the prior deal between Farriss and Pickens constituted a sale of 150 bales of cotton to plaintiffs at 10 7-8 cents per pound, f. o. b. Seminole compress weight guaranteed, and the tagging of the cotton with plaintiffs' tags constituted a delivery. Counsel for defendants says that nobody can tell what the confirmation means. He says that nobody will know what "B-C" means and nobody will know what "10 7-8" means, but we think any cotton man would understand this memorandum as completely as if it was written out in full. The cotton dealers have a custom of dealing with very few words, but with words that are perfectly understood among themselves. The same custom prevails among cattle men and tobacco men, wheat and corn men. They all have their formula for this thing or that thing, but it is perfectly well understood, and they have no trouble in understanding each word. We think that Farriss' testimony, applying the custom among cotton men to what he testified was done between him and Pickens, when standing alone, shows the sale of this cotton by Pickens to the plaintiffs, and that plaintiffs were the owners of the cotton at the time it was taken by the bank. Entertaining these views, we hold that the court erred in sustaining a demurrer to the evidence, and that it is unnecessary to review the other errors assigned. The case is, therefore, reversed and remanded, with directions to the trial court to grant a new trial.

By the Court: It is so ordered.